## Richmond.

### REED & RICE COMPANY, INC., v. WOOD.

January 17, 1924.

1. CARRIERS—*Negligent Delay in Delivery—Proof of Delivery and Acceptance.*—Proof of delivery and acceptance by the carrier for transportation is essential before there can be any recovery for negligent delay in delivery.

2. CARRIERS—*Action for Negligent Delay—Venue.*—In the instant case, an action for negligent delay in delivery was brought against a carrier in the circuit court of Middlesex county and defendant contended that that court had no jurisdiction because the cause of action did not arise in Middlesex county, and defendant's principal office was not in that county and it had no agent and did no business there.

   *Held:* That if it be conceded that the contract *for* the carriage was not made in Middlesex county, yet the contract *of* carriage was not completed until the goods were delivered to and accepted by the carrier for transportation, and as this took place in Middlesex county, the venue was properly laid.

3. ABATEMENT, REVIVAL AND SURVIVAL—*Nonjoinder of Parties—Code of 1919, Section 6102 and Code of 1919, Section 6265.*—Code of 1919, section 6102 provides that an action shall not abate by the nonjoinder or misjoinder of parties, but that new parties may be added and parties misjoined may be dropped at any stage of the cause. Section 6265 of the Code of 1919 provides that upon all contracts made by more than one person, whether joint only or joint and several, an action or motion may be maintained and judgment rendered against all liable thereon, or any one or any intermediate number.

   *Held:* In view of these provisions, an objection by defendant in an action upon a contract that if there was any liability on the defendant it was a joint liability with another, who was a necessary party, and that defendant could not be sued alone, was without merit, and that the trial court committed no error in refusing to require the joinder.

4. SHIPS AND SHIPPING—*Liability for Delay—Acts of God or Dangers of Navigation—Duty of Master.*—When there is no special agreement fixing the time of delivery, the vessel, if seaworthy, is not held for unreasonable delay proximately caused by acts of God or dangers of navigation such as boisterous weather. The master is also justified

in delaying his start during the existence of a violent tempest. But still he is bound to exercise at least ordinary forecast in anticipating the obstruction; and to exercise due diligence in accomplishing the transportation so soon as it ceases to operate.

5.  SHIPS AND SHIPPING—*Delay in Carriage—Judgment of Master—Negligence of Master—Cast at Bar.*—In the instant case, an action against the owner of a sailing vessel by a shipper for negligent delay in making delivery, the master testified that the delay was caused by stress of weather and his testimony was corroborated by other witnesses, and evidence of negligence on his part was slight, if there could be said to be any.

*Held:*  That the master of a vessel must use his judgment as to when he can safely put to sea, and great weight should be attached to his opinion, when fortified by such evidence as appeared in the instant case, as to stormy weather which detained him and other vessels in port and caused others to put back to port; and that the verdict of the jury in favor of plaintiff was contrary to the evidence and should be set aside, and final judgment entered for defendant.

Error to a judgment of the Circuit Court of Middlesex county in an action of assumpsit. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*C. S. Towles* and *T. J. Downing,* for the plaintiff in. error.

*W. D. Evans* and *W. B. Sanders,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This was an action upon a contract, brought by Wood against Reed & Rice Company, Incorporated, to recover the value of a cargo of watermelons shipped from Middlesex county to Baltimore, Maryland, which the plaintiff alleged became worthless by reason of the unreasonable and negligent delay of the defendant in

making delivery.    There was a verdict and judgment for the plaintiff. for $585.59, and the defendant assigns error.

The defendant set up by pleadings, duly sworn to, two preliminary objections before pleading to the merits.    First, that the circuit court of Middlesex county had no jurisdiction over the defendant in the cause because the defendant had its principal office in Northumberland county, and had no agent and did no business in Middlesex, and that the cause of action did not, nor did any part thereof, arise in Middlesex county. Second, that if there was any liability on the defendant, it was a joint liability with Edward W. Haynie, who was a necessary defendant, and that the defendant could not be sued alone.    Both of these objections were decided adversely to the defendant's claim.

[1,2] The first objection raises a question of venue. The plaintiff claims that the circuit court of Middlesex county had jurisdiction on the ground that a part of the cause of action arose in that county.    If it be conceded that the contract *for* the carriage of the melons was not made in Middlesex county, the contract *of* carriage was not completed until the melons were delivered to and accepted by the carrier for transportation, and this took place in Middlesex county.    Proof of such delivery and acceptance was essential .before there could be any recovery for negligent delay in delivery.    Compare, *Tate* v. *Yazoo, etc., R. Co.*, 78 Miss. 842, 29 So. 392, 84 Am. St. Rep. 649, and note; 4 R. C. L. 688, sec. 167; 24·R. C. L. 1308, sec. 414; *So. Express Co.* v. *McVeigh*, 20 Gratt. (61 Va.) 264, 288-p.    The venue, therefore, was properly laid.

[3] It is claimed by the defendant that the contract was made by Capt. Dize as master of the schooner "Eva Bramble," which was owned jointly and equally

by the defendant and Edward W. Haynie, and hence is the joint contract of the two. If it be conceded that the contract of hiring was a joint contract between Wood on the one side and Reed & Rice Company, Inc., and Edward W. Haynie on the other, that was no ground for abating the action, as it is provided by section 6102 of the Code that "No action or suit shall abate or be defeated by the nonjoinder or misjoinder of parties, plaintiff or defendant, but whenever such nonjoinder or misjoinder shall be made to appear by affidavit or otherwise, new parties may be added and parties misjoined may be dropped by order of the court at any stage of the cause as the ends of justice may require." Furthermore, section 6265, declares that "Upon all contracts hereafter made by more than one person, whether jointly only, or joint and several, an action or motion may be maintained and judgment rendered against all liable thereon, or any one, or any intermediate number." The Code went into effect January 13, 1920; and the contract in suit was made in August, 1920, so that the contract comes within the operation of the Code, and the facts of the case do not show that the ends of justice required the joinder. The trial court committed no error in refusing to require the joinder of Edward W. Haynie as a party defendant.

The defendant also assigns as error the refusal of the trial court to set aside the verdict as contrary to the evidence. Pursuant to agreement between the parties, Capt. Dize, in command of "Eva Bramble," reported at the wharf of the plaintiff, Wood, on Sunday, August 22 1920, to carry a cargo of watermelons to Baltimore. The "Eva Bramble" is a small sailing vessel of about fifteen tons burden, net, without a gasoline engine, or other auxiliary power, but has a small boat used as a yawl, with a three horse power gasoline engine. The

account of the trip to Baltimore is thus detailed by Capt. Dize:

"When I reported for this load the 'Louise Virginia,' which is a power boat and also carries sail, was there to load watermelons for Mr. Wood also, and Mr. Wood asked me if I would give way and let him load her first because she was a power boat and could go up the bay against the wind; I agreed to this, and the 'Louise Virginia' loaded first, they started loading me on Monday afternoon and finished Tuesday before noon; before they put on the last two wagon loads, I told Mr. Chisley, who was grading the melons for Mr. Wood, that my vessel was loaded. Mr. Chisley called ashore to Mr. Wood, and told him what I said. Mr. Wood insisted that I carry these two loads and I put them on. This gave me a heavy load. I at once started on my voyage, leaving Mr. Wood's landing about noon of Tuesday, August 24, 1920, and sailed on down the Piankatank river, and anchored in Fishing bay, a harbor on the Piankatank river, about six miles from Mr. Wood's landing. I anchored in Fishing bay for harbor because the wind was northeast, which is a head wind going up the Chesapeake bay, was blowing fresh, and it was too rough outside for me to go up the bay. When I got to Fishing bay I found some seven or eight boats loaded with watermelons, bound to market, that had put in there for harbor on account of the weather. The most of these boats were much larger than mine and all of them had power, being propelled by gasoline engines. When I went in Fishing bay for harbor I also found the schooner 'J. R. Teal,' Capt. Perry Davis, she being a large schooner of about one hundred fifty tons, partially loaded with coal, lying there for harbor, she was bound up the bay for the Great Wicomico river. The wind blew too hard every day that I stayed there for me to

go out.  I watched closely the weather conditions as I was anxious to go on my trip.  I could tell how the wind was blowing by the 'Jack' at the masthead of the boat, and that on two days I went up on the hill on a strip of land so I could see out on the bay, and went out on Saturday, which was just as soon as I thought it was safe to go.  This was the best and only day since I had been there that I considered it safe to go out.  I knew that on Thursday, while I was lying in Fishing bay, Capt: Perry Davis, in the schooner 'Teal,' and a large schooner loaded with watermelons, and a smaller bugeye was compelled to return to Fishing bay for harbor by stress of weather.  When I got up to the Great Wicomico on Saturday evening, I found the large watermelon schooner that had left Fishing bay on Thursday, lying in there (Great Wicomico) for harbor, this boat had gasoline power as well as sail, and she could not go up the bay because of the weather.  When I left Fishing bay on Saturday morning, August 28, 1920, bound for Baltimore with my load of melons, only two other boats ventured out and they were both much larger than mine.  The other boats that I found in Fishing bay when I went there Tuesday were still lying there for harbor when I left there Saturday.  The two boats that left Fishing bay on the same day that I did were much larger than my boat and both had gasoline power.  They tried to go further up the bay, but were compelled to come back to the Great Wicomico river for harbor, on account of the wind.

"After I left Fishing bay, the wind blew away my foresail, and I had to take it down, and proceed up the bay as best I could.  By reason of the high wind and heavy seas, my boat took in much water.  This was possible, because loading watermelons the hatches over the vessel's hold are never battened down tight, be-

cause the watermelons must have air, and the melons that were on deck are piled upon the hatches. I was compelled to use my pumps all of the time I was in the Chesapeake bay on that occasion, and I made the first harbor that I could for safety and repairs, which was the Great Wicomico river. I reached Cockrell's creek in the Great Wicomico river late on Saturday afternoon of the same day that I started from Fishing bay. The foresail that had been blown off my boat was wet and could not be worked on that day. On the following day, Sunday, just as soon as the sail got dry enough to work on, which was about midday, I begun to mend my sail, and worked on it continuously until it was too dark to work. The following morning the weather conditions being improved, I started early on my way to Baltimore, under what sail I had, and with the help of my little gasoline boat, which I used in shoving the schooner, at the same time I worked on my sail until I repaired same, so that I could use it. I at once put it on and then went to Baltimore, arriving there on Tuesday afternoon late."

Raymond Haynie was the mate for Capt. Dize on this trip, and gives the same account of the trip and of the weather conditions prevailing. Clinton Haynie also accompanied Capt. Dize on the trip and gives the same account of it. He also testified that no boats left Fishing bay until August 26th, and that no other boats besides those mentioned by Capt. Dize left Fishing bay until Saturday, August 28th. Capt. Davis, master of the "J. R. Teal," a schooner of about 150 tons burden, referred to by Capt. Dize, had been following the water the greater part of his life. He anchored in Fishing bay Monday night, and did not attempt to leave until Thursday. He gives the following account of weather conditions there at the time: "There were several

7

boats loaded with watermelons, bound for market, in there when I got there; watermelon loaded boats came in there every day for harbor as long as I stayed there, but none left until I left, which was on Thursday, August 26, 1920. I watched the weather conditions closely, as I was anxious to get up to my home at Reedville with my coal. On Thursday afternoon the wind lulled a little, and I started out. One large schooner and a small one, both power boats, and watermelon loaded, followed me out. When we got outside the wind breezed up again and the smaller of the watermelon boats had to turn back. I beat on up the bay, washed badly and (had) to shorten or take in part of my sails, the wind continued to increase and if I had to have gone five miles further I would have been compelled to return to Fishing bay for harbor. The large watermelon schooner came into Cockrell's creek for harbor the evening of the same day, and was still there Saturday night. I watched the weather conditions closely, and there was no time from Monday, August 23, 1920, until Saturday, August 28, 1920, that a small boat the size of the 'Eva Bramble,' without power and loaded, could have safely gone from the Piankatank river up the Chesapeake bay. I knew the schooner 'Eva Bramble' and knew her crew during the summer of 1920. She was at that time in good seaworthy condition, had a good skipper and a good crew.

"I saw her when she came in Fishing bay on Tuesday, August 24, 1920, and left her anchored there on Thursday, August 26, 1920."

The plaintiff, Wood, had testified that he had "told Capt. Dize if when he got out he found the wind northeast, and he could not get to Baltimore, to take the melons to Washington," and to wire him when he got there. In order to show that Capt. Dize could have

gotten to Washington by sailing up the Potomac river, the plaintiff introduced six witnesses. Each of these witnesses was on the Chesapeake bay at some time between August 24th and 28th, and each one of them testified that he could not say that Capt. Dize was negligent by staying in Fishing bay harbor as he did, and each one that testified on the subject stated that he did not meet any sail boats going up the bay between August 24th and 28th. One or two of them met boats going up the Potomac river, but it is some distance from Fishing bay to the mouth of the Potomac. All of plaintiff's witnesses who were on the bay during the time mentioned were either in power boats, or having auxiliary power. Capt. Games left Washington August 25th and came down the Potomac and the bay, reaching Fishing bay on the 25th. He met no schooners going up the bay, but did meet three schooners going up the Potomac, at least one of which he knew came up the bay, but says nothing as to how it was propelled or as to its size. His own boat was a power boat and he returned up the bay on the 29th, when the weather conditions had changed.

G. L. Hardy testified that he was in the "Chesapeake bay only a few hours from August 23 to August 28, 1920," and that he could "see no reason why Capt. Dize couldn't have gone up the bay the night we came down," but he does not state what night he came down. It may have been, and probably was the 28th, the very day that Capt. Dize tried to go up. This same witness states that he met no schooner going up the bay, and also that "he couldn't say that Capt. Dize, in the 'Eva Bramble,' was negligent by staying in Fishing bay as he did." Two other witnesses, Fleet and Wormley, who testified to being on the bay between August 24th and 28th, were in power boats and used their engines

to make the trips, and Wormley says: "On my trip down the bay on August 25th, I saw no sail boats bound up the bay." The entire testimony of Melvin Revere was as follows: "That he lived in lower Middlesex county; that he was in a power boat, which also had sails. He loaded with melons on the Rappahannock river on Tuesday, August 24th, and left on the 25th, bound for Washington. That night he went into Indian creek, a harbor above the Rappahannock for harbor, and went into the Great Wicomico on Thursday night for harbor. That he left the Great Wicomico on Friday and went to Washington, the wind was northeast, which was fair up the Potomac. He used his engine as well as his sails. Could not say that Capt. Dize was negligent by staying in Fishing bay, as he did.

"I did not see any weather at that time which would, in my opinion, prevent the 'Eva Bramble' from going up the bay." It will be observed that this witness was in a power boat, and yet had to seek harbor two nights on his trip. He states nothing as to weather conditions on the Chesapeake bay at Fishing bay, or as to his knowledge of the "Eva Bramble." He simply ventures an opinion that the weather would not have prevented the "Eva Bramble" from going up the bay at that time, and in the same breath states that he "could not say that Capt. Dize was negligent by staying in Fishing bay as he did." No witness for the plaintiff testified to seeing any sail boat going up the bay between August 24th and 28th.

[4, 5] In 24 R. C. L. 1342, sec. 452, it is said: "When there is no special agreement fixing the time of delivery, the vessel, if seaworthy, is not held for unreasonable delay proximately caused by acts of God or dangers of navigation, such as boisterous weather, * * and the master is also justified in delaying his start during the

existence of a violent tempest   *   *   but still he is bound to exercise at least ordinary forecast in anticipating the obstruction; and to exercise due diligence in accomplishing the transportation so soon as it ceases to operate." We are of opinion that these requisites were complied with.

The master of a vessel must use his judgment as to when he can safely put to sea, and great weight should be attached to his opinion when fortified by such evidence as appears in this case. The evidence of negligence on the part of Capt. Dize is negligible, if there can really be said to be any, and the verdict of the jury was plainly contrary to the evidence and should have been set aside by the trial court. The judgment of the trial court, therefore, will be reversed, the verdict of the jury set aside, and final judgment entered in this court for the plaintiff in error, Reed & Rice Company, Inc.

*Reversed.*